Hear, read, hear, read, hear, read. The United States Court of Appeals for the 11th Circuit is now open according to law and code of safety of the United States and this honorable court. Thank you. Good morning. I wish I could see you all, but it's good to have you with us. We appreciate you participating in this way. Of course, not so many cases in the 11th Circuit are designated for oral arguments. So since your case was designated for oral argument, it probably means somebody had some questions about how it should come out. So it's helpful for us to hear from you. Judge Newsom is also on the line, as is Judge Dierman O'Scanlan, who is with us from Oregon this morning. That's why we have the noon start time. We're delighted to have him with us. Thank you, Judge Martin. Thank you for being with us. Judge Newsom was actually Judge O'Scanlan's law clerk at some point, and I think he wanted to speak to that. Yeah, well, thank you, Judge Martin. I just wanted to say we always welcome our visiting judges, and we thank them so much for their assistance in helping us discharge our duties. But this is a unique experience and privilege and pleasure for me to be able to sit on a panel with my former boss, Judge O'Scanlan. I guess the lawyers on the line might have heard me refer to him as boss when he joined, and that's always the way that I will think of him. He has always told me to call him Dierman, and I have always respectfully declined. I will always call him Judge O'Scanlan. He'll always be Judge O'Scanlan to me. But it is heartbreaking to me, selfishly, that the pandemic has caused us to have to do this telephonically because, again, selfishly, I was looking forward to leaning in and looking down the bench and seeing him on the other end of it. But I'm just thrilled to have him with us, and the lawyers are in for a treat. It's a special privilege for me to have him on the panel with us. So thank you, Judge, for being here. And thank you, Judge Newsom. It's a great pleasure for me and an honor. Thank you. All right. Well, I'm glad to be a part of it, too. I think that means we're probably ready for our first case. We told you in our notice that we're going to give you two minutes of uninterrupted argument. I'm sitting here with my stopwatch, so I'm going to try to abide by that. And with that, if counsel is ready, I think you're going to get a two-minute warning before the end of your time as well. I'm checking with my... Valerie, is that right? That would be correct, Judge. All right. Well, thank you so much. With that, I'll call the case of Genworth Life and Annuity Insurance Company v. TVPX. Good afternoon, Judge Martin, Judge Newsom. Good morning, Judge O'Scanlan, and may it please the Court. My name is Glenn Bridgman, and I represent the appellant, TVPX. Our claim here is that in 2013, 2014, and so on, Genworth breached its ongoing obligation to determine rates in accordance with mortality because it developed new mortality expectations but charged plaintiffs that were not determined based on that new mortality in breach of the terms of the policies. Now, the District Court erred below by reading the 2004 McBride Settlement as extinguishing that ongoing obligation to set rates according to updated mortality. But the McBride Settlement said nothing about whether, going forward, Genworth was required to comply with its ongoing contractual obligations with respect to mortality. And to the contrary, the settlement agreement explicitly said that, going forward, Genworth would administer the policies in accordance with their terms. And that makes sense because under the terms of the McBride Settlement, these policies were going to remain in force for many years to come. This isn't a settlement in which Genworth was somehow wiping its hands of all liability under these policies. Instead, Genworth was going to keep insuring the class, keep collecting premiums, keep paying out death benefits under these policies going forward. And our claim here is simply that Genworth took actions from 2013 forward that were inconsistent with the terms of the policies that Genworth had agreed to keep in force. The District Court's finding that Genworth didn't have an obligation under the terms of the policies as a result of McBride was error for a number of reasons as we set forth in our briefs. But I want to start with the language of the settlement agreement because I think it's the simplest and most straightforward way to resolve the case. The District Court, in construing the settlement agreement, focused on the definition of release conduct and specifically the fact that in the list of release conduct, the phrase cost of insurance rates does apply. But what the District Court didn't analyze is whether release conduct only covered actions that Genworth had actually taken up to the time of McBride or whether release conduct referred to any conduct that Genworth takes whenever, including decades into the future. Counsel, I'm sorry. This is Judge Newsom. So I guess I've got a question for you. I took in your briefing you to be making two slightly different arguments. One is that substantively, the allegations contained in your new lawsuit were different from the allegations in the McBride suit. Namely, that that suit was really about fraud and the inducement, if you will, and that this suit is really about cost of insurance. And so there you've got to contend with the language of the McBride complaint and the language of the McBride notice and the language of the McBride release, as you've said. But now it's – and then the second argument, and it sounds like the one that you're focusing on here, is what I'll call temporal. I guess like a temporal distinction. You keep saying on a going forward basis, sort of post-2013, is that really the horse that you're riding here is that the conduct in the current suit may not be different in kind, but it's different in time? I would say we're riding both horses, if that is possible. It's both that it's different in kind and time. And really they're the same thing, because the fact that McBride was about sales practices and was about what took place back in 2004 means that – the subject matter distinction means that there's that temporal distinction that I'm attempting to draw between litigating cost of insurance rates back in 2004 and Drenmore's ongoing obligation to reset cost of insurance rates going forward as its mortality expectations evolve.  But you don't – I guess you don't deny, do you, that the McBride action, although it was maybe principally about sales practices and fraud and the inducement, it also did have – it's kind of a rangy complaint, right? I mean, it did have some allegations of what I'll call just sort of garden variety breach of contract and sort of enforce this thing in conformity with the policy terms, stuff like that. And it certainly did mention cost of insurance. It mentioned cost of insurance in two various – in two allegations, Your Honor. And in both allegations – and I'm happy to discuss either one – both allegations are about the way cost of insurance had been set in the past. And I also think you have to read the allegations about cost of insurance in light of what was being alleged in McBride. McBride was a case about this planned premium issue in which the face of the policies had a planned premium and policyholders weren't happy when it turned out that they would have to pay more than that planned premium. And the cost of insurance played kind of a mechanical role in the fact that sometimes policyholders would have to pay more than the planned premium. But it wasn't at the core of the case, which is really about the premiums they would have to pay in an environment of falling interest rates. So I do admit that the words cost of insurance appear twice in the McBride complaint. I just don't think it's at the core of the case. Mr. Bridgman, this is Judge O'Scanlan. I'm looking at the settlement agreement, and in particular page 7 of the agreement, which I gather is AA0392 of the record. This is the release and waiver provisions. And I look at that and wonder – and I'd appreciate your response – when it says class members acknowledge that they are releasing both known and unknown and suspected and unsuspected causes of action and are aware there may hereafter discover legal or equitable claims or remedies presently known or unsuspected or facts in addition. In other words, this release is extraordinarily broad. Why shouldn't that provision include the issues that you are raising now? Because, Your Honor, Judge O'Scanlan, there are claims unknown or known related to the release conduct. So the key question in analyzing the scope of that provision you just quoted is, is release conduct limited to things that took place before 2004 or does release conduct include any conduct that Genworth ever takes? And I would submit that it has to be limited to pre-2004 conduct because if you read release conduct to encompass any actions Genworth ever takes, no matter when, then the release encompasses all of Genworth's obligations on these policies, including the obligation to pay death benefits. And that just doesn't make any sense because the McBride settlement, which is a contractual matter, clearly contemplates that these policies are going to remain in force. And I think the easiest way to see this is if you look at the definition of released conduct, which we quote in our blue brief on page 16, there's a long list of topics that falls within release conduct. One of them is cost of insurance rates, but then if you look at the next topic, it's the death benefit. And so our claim here is Genworth breached the contract in 2013 by failing to adjust cost of insurance rates. If that is release conduct, if an action that Genworth took in 2013 is release conduct, then Genworth failing to pay the death benefit in 2013 would also be release conduct. And I'd submit that doesn't make sense either as a matter of common sense or as a matter of contractual interpretation. And Genworth agrees because they've conceded that this release doesn't release. They've conceded that this release does not release claims related to death benefits. And that concession is fatal to their claim because there's no way they can draw a distinction between the two. Either both death benefits and cost of insurance rates in 2013 are released or neither are. They've taken the position that death benefits in 2013 aren't released. That means that cost of insurance rates in 2013 similarly don't have to be released. If I could turn briefly to the identical factual pedicate doctrine, I think as Judge Newsom mentioned earlier, this kind of imposes an outer limit on the scope of the release. So no matter how broadly it's worded, it can't be broader than the identical factual pedicate. And there's a long line of cases in the weapons circuit, Kilgore, Manning, Piper Aircraft, which say that subsequent facts give rise to new factual predicates. And that the key inquiry is whether the facts that are being asserted in the later case could have been litigated at the time of the earlier case. And there's simply no way we could have litigated this case back in 2004 because the 2013 mortality expectations that are at the core of our case, they wouldn't exist for another 10 years. Even if we were to, we couldn't make the factual allegations that we make in our complaint. And so there was no way that we could have litigated this claim back in 2004, even if we had wanted to. And so the identical factual predicate doctrine, just from a temporal perspective, also places this outer limit on the scope of the settlement agreements release, no matter how broadly you read the release itself. Finally, if I could just turn to the settlement administration or the policy administration provision. The policy administration provision, which we quote on page 17 of our blue brief. Counsel, your time has expired. All right. You can finish up, counsel. You can finish up. Thank you, Your Honor. It especially affirms Genworth's ongoing obligation to administer the policy in accordance with its terms. And if you read the release as Genworth does, that provision is defined of all meaning. Thank you, Your Honor. Thank you. Mr. Mattson? Yes. Good morning or good afternoon, as the case may be. This is Eric Mattson on behalf of Genworth. And I wanted to begin with a couple of truisms about class action litigation. The first is that companies often settle class actions even when they genuinely believe they've done nothing wrong. They think they've done nothing wrong, but they realize that the risk of a bad outcome is significant enough that they go ahead and settle. The second truism is that when companies do settle class actions, they bargain for the broadest and longest lasting piece that they can get. Because the last thing they want to do is pay a lot of money to settle a class action and turn around the next day or the next week or the next month or even the next decade and be fighting the same sorts of battles that they had just resolved. And those truisms apply to this appeal that's before this panel today. Because if you look back to 2004, after Genworth had slogged through discovery, slogged through motion practice and reached a class-wide settlement agreement, it's bargained for the broadest and longest lasting piece it could get. That McBride case was kind of a kitchen sink attack on not just how Genworth sold these insurance policies, but also how it administered those policies over a number of years. And so when Genworth negotiated the settlement agreement, it negotiated a release in covenant not to sue that looked backwards in time, which virtually all releases do. But this one also looked quite consciously forward in time as well, and it did that in at least a couple of different ways. It says in the... the settlement agreement does in the covenant not to sue provision that class members were precluded and estopped from suing over released claims regardless of whether those causes of action accrue after the agreement is approved. And then it also, in this pre-settlement policy administration provision, gave Genworth the right to administer policies in the same manner as it had in the past. So, Counsel, this is Judge Newsom. Can I ask you a quick question? So back to the question that I was asking your friend earlier. So, I mean, frankly, to the substantive point that I was making, that the two causes of action just sort of don't arise from the same sort of substance, I don't really think that I agree. I mean, it seems to me that cost of insurance was in play in the first suit, cost of insurance is in play in this suit if you look at the complaint and the release and the rest. I do wonder, though, about the temporal aspect. I mean, his point is, look, our contention in the second case was that from 2013 onward, Genworth wasn't adjusting cost of insurance according to mortality tables that come out on an annual basis. So how could we possibly have known about that in a way that would have been encompassed in the first suit? And the only way it seems to me that... or maybe you can tell me, but the only way that springs to mind that you can make that work is to say that, well, it's just all part of the same continuing course of conduct. Is that right? And if so, do we know whether you were doing then what you are alleged to be doing now? So I would agree that... when you're looking at what happened after 2004, because, of course, the focus now is on 2013 forward, but you could say the same thing about a lawsuit that had been brought a month after the McBride settlement was enforced. The same arguments would apply then. It doesn't matter. So temporal is really not so much about whether it was a decade or more later. It's was it after the settlement was entered into. And I think there are a couple of breaks on the concern that I'm reading between the lines hearing the court express about forward-looking releases, forward-looking sort of race judicata effect. And that is that first is under this... It's called different things. Identical factual predicates or same nucleus of operative fact. You need to have some kind of overlap, not literal identity, but overlap between the two different types of factual predicate that you're talking about. And when you look at the record in this case, what we do know is that plaintiff itself, TVPX itself, alleged in the initial complaint that it filed in the Eastern District of Virginia. Which is no longer a part of the litigation here. I mean, they amended that complaint. This is Beverly Martin speaking. You're still riding on a complaint that's no longer an operative complaint in this sense that it's not the operative pleading, but admissions that are made in a superseded complaint are still admissions. And what TVPX said in that initial complaint was that first, we're going to allege a class period that stretches back decades. Back really probably to the... They said in the hearing with Judge Land, yeah, we amended that complaint because we learned that the facts alleged in it were no longer true. I mean, that accounts for something, doesn't it? I don't quite remember them saying it quite that way. I think what they told Judge Land is, well, we don't really know what changes if any, Genworth has made and how it calculates cost of insurance rates. And at a minimum, this would be in my view a necessary but not sufficient condition, they would need to allege some kind of material change in how Genworth went about setting those rates. If they said that previously they did it one way and now today they're throwing a dartboard and coming up with another way, we'd be having a very different conversation about this case right now. I'm sorry to talk of you, but in response to Judge Newsom's question, as I heard it, how in the record do we know that Genworth has been calculating this cost of insurance the same way ever since or for all time or whatever, at least before 2004? Where in the record is that? Well, the main thing I would point to again is the initial complaint that TVPX filed, which presumably it filed only after it... I'm sorry, I don't mean to interrupt. Is there anything else other than the complaint? About what Genworth has done post-2004? Not that I can recall. Okay. Well, but what about pre? I mean, I guess my question is I want to figure out if this is the same course of conduct. It seems to me that that matters. If it is the same continuing course of conduct that was live pre-2004 and that remains live now, then that's a good fact for you. If, in fact, you weren't really doing pre-2004 what you are alleged to be doing now with respect to mortality tables, then I think that's a good fact for your opponent. And so I think Judge Martin is asking you, how can we figure that out? What was happening pre-2004 and post-2004? Well, the district court raised that question in the district court's discussion with TVPX's counsel and said, well, it sort of floated the idea maybe we should have some discovery about this very question. What has happened since 2004? And TVPX's counsel demurred, said we don't really want to go there, did not really take the district court up on that concept. And I would also say that what we would be talking about there is if you suddenly wanted to allow discovery into what Genworth has done with respect to cost of insurance rates and how it's calculated those rates for the last 15 or more years, then Genworth would be deprived of the benefit of the release and would be doing exactly what it would have to do if the case were just allowed to go forward in the first place. Let me tell you what my problem is with that argument, just so you know and give you a chance to address it. That, you say, well, it's the plaintiff's fault for not having that in the record because they didn't do discovery, but as I understand it, your case is based on res judicata. We've already litigated these claims. These are the same claims. But that's an affirmative defense. So why isn't it your responsibility to come in and say here's why it's the same nucleus of facts? Well, first let me note that we're suggesting that this court can affirm based not only on res judicata but also on the doctrine of release, which is what the Third Circuit did in the Freeman case that we cited in our brief. So it's not limited to res judicata. It's also the doctrine of release and covenant not to sue. And if you look at Freeman, if you look, in fact, at this court's precedent in cases like Adams v. Southern Farm Bureau, what the court did and what the district court did here was compare the records in the two different cases and determine that there was enough overlap between the claims in one case and the claims in the other case that whether under the doctrine of res judicata or release that those new claims had been extinguished. I understand that. And so if we undertook that and we compared the two and there's a big fact missing about how your client calculated these insurance rates and it was your affirmative burden to show that the facts are the same, then why don't you lose? Well, first, I think when you do compare the complaints, the two different complaints, you will see the same allegations of the same course of conduct of the same basic allegations of raising rates when you shouldn't raise them or failing to lower them in the face of supposedly improved mortality. That is the same course of conduct in both complaints and that's enough under cases like Adams, under cases like Freeman to sustain whatever burden we might have to show that the release applies and the second case is appropriately enjoined or that res judicata applies and that the same result obtained. Counsel, this is Judge O'Scanlan. Could you remind us of the status of the record with respect to the discovery issue? You mentioned that it was waived by TVPX. Give us a little more context, please. Sure. Well, the first is I'll point to the absence of something, which is the absence of any request at any point during the few months that the case was pending in the middle district of Georgia from TVPX for any discovery at all from Genworth. It wasn't issued to us. They didn't ask for permission to issue it and then when the district court raised this question and it was quite clear where the court was going. It was wondering about the same issues that this panel has asked about. Should there be discovery? What if I allowed you discovery and the TVPX's lawyer at that point did not bite on that suggestion? Thank you. Again, I wanted to circle back to another point, which is that we did initiate a cross appeal about the district court's denial of our request to pursue a counterclaim against TVPX. We're comfortable resting on our briefs on that point, but I wanted to In the minute that I have left, I wanted to ask if the panel invite the panel to ask any questions about that. I actually do have a question about that. Isn't there a procedural problem with that? It looked to me like you moved to file that counterclaim under Rule 15A, which of course doesn't apply to post-judgment. You should have moved under 15D. Is that a bigger problem to you? No, Your Honor. It won't surprise you to hear me say no. I believe we also referred to Rule 13, which is also potentially applicable here. If that was an error, it seems like the kind of error that ought to be correctable as opposed to the end of the road. I guess my opinion is not really the one that matters here, but to me, the real question is whether there's a viable claim that passes the futility test in the first place, and we've tried to explain in our briefs why it does pass that test. This is Judge Newsom. I had the same question. You understand Judge Martin's question is you were seeking to amend a pleading in a case that had long been closed. That just seems weird. Right? I would have thought maybe not even 15D. Maybe I don't have 15D in front of me, but I would have thought we were talking about Rule 60 or something like that. It's not weird. It's a very odd situation, but when you consider the alternatives, it's perhaps the least weird approach because the final judgment entered in McBride expressly said that any disputes over the interpretation of this agreement need to be brought to this court. I suppose we could have just brought a brand new lawsuit, a breach of contract claim in the same district and then perhaps had it related to the McBride case and ensure that it went to the same judge, but I'm not sure that that procedurally would have made any difference at the end of the day. I would agree, though, that this is an odd situation. It's one that is not often raised. Counsel, the time has expired. Thank you. Thank you very much. Thank you. Am I unmuted? Yeah, we can hear you. I can hear you. Thank you, Your Honor. Just a few points. This is Mr. Yes, this is Mr. Brejnan. Thank you. A few points. I would like to begin with this question of what was in the record below. I think I heard counsel concede that there is nothing in the record below about what Genward's cost of insurance practices were back in 2004. The district court's opinion here expressly relied on what Genward's cost of insurance practice was for back in 2004 from page 21 of the record.  that Genward's cost of insurance practices that were in existence at the time of the settlement. What was that issue is what Genward was doing back in 2004. There is no evidence in the record about that. On the question of this amended complaint. Hold on. Can I ask you a question? What about his point, though, that really doesn't distinguish this case from Adams. Adams just lined up allegations against allegations and said it looks the same. Two points, Your Honor. In Adams, the court expressly drew the future conduct distinction that we are talking about here. It rejected the future conduct argument because it said the new allegations also arose because they are fraud allegations. Fraud allegations arise back at the time of sale, so those allegations arose back at the time of the initial case. I don't think Adams really gets them where they need to go, which is we are going to cover not only allegations that arise at the time of the initial case, but also facts that won't occur for another decade. Mr. Bridgman, Judge O'Scanlan speaking. I'm troubled by the attempt to pursue discovery, particularly in light of the temporal claims that you are making. What's your response? Yes, Your Honor. Respectfully, I think counsel may have slightly misrepresented what took place below. What was happening at our argument was we were asked, do you think you win on the law, even if aside from this discovery issue? And we said, yes, we don't think we need discovery to win on our legal points about the interpretation of the settlement agreement. We said nothing about not needing discovery if the Senate would end up turning on a factual question. In terms of why we didn't promulgate discovery, I think it goes to the kind of weird factual and procedural posture we're talking about here. This was a closed case. It had not yet been reopened pursuant to Rule 59 or Rule 60. So it is entirely unclear about whether we could have promulgated discovery or class. And finally, I think I'd park. Yes, Your Honor. Well, then aren't you bound by the state of the record at that point? And if we disagree with you in terms of the interpretation of what the reach of the settlement was, then where do we go from there? Well, I think that goes to one of George Martin's points, Your Honor, which is that this is a Rule 8 affirmative defense of the burden is on Genworth to come forward with the evidence. There is no evidence one way or the other. And so on the bare record, when we're just at the pleading stage, the fact that they have not come forward with that evidence should be dispositive and require further fact-finding. A few other comments. On the continuing course of conduct idea that I believe Judge Newsom raised, and I think also appears in the district court's opinion, several cases in this circuit have rejected the idea that just because there's a similarity between previous conduct and subsequent conduct that that kind of congeals into one claim. I point you to the Kilgore case, which I believe they cite in their briefs, where they say that subsequent conduct, even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action. Similarly, the Klein case, in which the similarity is much closer than the similarity read here, they still found that subsequent wrongdoing gave rise to new claims that weren't foreclosed by the earlier release. Lastly, on this question of the identical factual predicate and why their position doesn't eliminate all of Genworth's contractual obligations under the policies, I believe counsel said that, hey, our reading of the release is really broad, but we've got these breaks because it wouldn't be the identical factual predicate. I just don't think that's correct. If you look at the McBride complaint, the McBride complaint has explicit allegations that that failure pays death benefits. I'll quote from paragraph 17 of the McBride complaint, this is in the appendix, at page 553, in which it says, the purpose of defendants' plan and scheme was to obtain a forfeiture of thousands of universal life policies after insureds had paid hundreds of millions of dollars in premiums, thereby avoiding payment of death benefits. So, if cost of insurance was part of the factual predicate of McBride, surely death benefits is also part of the factual predicate of McBride and they're back in the same place where they can't distinguish between their argument saying we have no future obligation to pay death benefits and their argument saying we have no future obligation to adjust cost of insurance rates. Counselor, your time has expired. Thank you, Your Honor. We ask that you Go ahead. We ask that you reverse the injunction below and allow us to proceed. Thank you. We appreciate the presentation of a well-argued case even under these circumstances. So, thank you.